**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

**ROANOKE CEMENT CO., LLC,**

        **Plaintiff,**

**v.**                                                                   **Civil No. 2:07cv97**

**CHESAPEAKE PRODUCTS, INC.,**
**FRIT, INC.,**
**FRIT INDUSTRIES, INC.,**
**SHELTON E. ALLRED,**
**CARL E. SCHAUBLE,**
**DAVID W. BENEFIELD,**
**JAMES M. WYATT,**
**and**
**TERRY W. TEETER,**

        **Defendants.**

## OPINION & ORDER

Before the Court are two (2) Motions to Dismiss for lack of personal jurisdiction, filed by

Defendants Frit Industries, Inc. (Docs. 6 & 7), Frit, Inc., Shelton E. Allred, Carl E. Schauble,

David W. Benefield, James M. Wyatt, and Terry W. Teeter (Docs. 8 & 9).  Because the Court

**FINDS** that it may exercise personal jurisdiction over these defendants, Defendants' Motions to

Dismiss are **DENIED**.

### I. PROCEDURAL HISTORY

Seven (7) of the eight (8) defendant's to the above action have filed Motions to Dismiss

for lack of personal jurisdiction Plaintiff Roanoke Cement Company's ("Plaintiff" or "Roanoke")

1

claims alleging voluntary conveyance (Count IV) and fraudulent conveyance (Count V).  Docs. 6-9.  These Defendants include two (2) corporate defendants—Frit, Inc. and Frit Industries, Inc. ("Frit Industries")—as well as five (5) individual defendants: Shelton E. Allred, Carl E. Schauble, David W. Benefield, James M. Wyatt, and Terry W. Tetter ("individual defendants"). Doc. 1.  The remaining Defendant, Chesapeake Products, Inc. ("Chesapeake") has filed an Answer, conceding personal jurisdiction.  Docs. 10, 13.

On May 4, 2007, Plaintiff filed its Response to Defendants' Motions (Doc. 15), together with a Motion for Leave to Conduct Jurisdictional Discovery (Doc. 14), which it relies upon "in the event the Court concludes [Plaintiff] has failed to bear its burden of demonstrating that the Court has in personam jurisdiction over some or all of the defendants."  Defendants together filed their Rebuttal Brief (Doc. 18) and Memorandum in Opposition to the Motion for Leave to Conduct Jurisdictional Discovery (Doc. 19) on May 14, 2007.  A hearing on this matter was held on June 12, 2007.  See Docket No. 2:06cv381.

## II. STANDARD OF REVIEW

### A. Personal Jurisdiction

Rule 12(b)(6) of the Federal Rules of Civil Procedure requires that "the plaintiff need only make a prima facie showing of personal jurisdiction," and "the court must take all disputed facts and reasonable inferences in favor of the plaintiff."  Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc., 334 F.3d 390, 396 (4th Cir. 2003).  However, the plaintiff bears the burden of alleging personal jurisdiction.  FED. R. CIV. P. 8(a).  In meeting this burden,  "[m]ere allegations of personal jurisdiction are sufficient to make the required prima facie showing." Charter Communications VI v. Eleazer, 398 F.Supp.2d 502, 504 (S.D. W.Va. 2005) (internal

citations omitted).  Where the existence of personal jurisdiction is properly challenged by a defendant, however, the plaintiff bears the burden of demonstrating personal jurisdiction by a preponderance of the evidence.  Combs v. Bakker, 886 F.2d 673, 676 (4th Cir.1989).  In considering such a challenge, "the court must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction."  Id. at 676.  In deciding the Motions, this Court has so construed Plaintiff's allegations, but has not made findings of fact for any other purpose.

To determine whether it has personal jurisdiction over the defendants, the Court must resolve two issues: (A) whether the action falls within the ambit of Virginia's long-arm statute, VA. CODE ANN. § 8.01-328.1, and (B) whether the due process clause of the Fourteenth Amendment permits jurisdiction.  ESAB Group v. Centricut, 126 F.3d 617, 623 (4th Cir. 1997). "[I]t is well-settled that the provisions of § 8.01-328.1 [Virginia's long-arm statute] extend personal jurisdiction to the outermost boundaries of due process." DeSantis v. Hafner Creations, Inc., 949 F.Supp. 419, 422 (E.D.Va. 1996) (citations omitted); Chung v. NANA Development Corp., 783 F.2d 1124, 1127 n.2 (4th Cir. 1986) (because "the Virginia long-arm statute has been repeatedly construed to assert jurisdiction to the extent due process permits . . . the state law and due process analyses are identical").  Therefore, the two-step personal jurisdiction inquiry is effectively merged, though it remains possible for there to exist personal jurisdiction under the due process clause and still not meet the standards required by § 8.01-328.1.  See id. ("Virginia's long-arm statute provides a ceiling of procedural protections above the federal floor of due process.") (citations omitted).

In the present matter, it is further important to clarify how a court must evaluate the

contacts of a corporation.  "A corporate agent is not subject to personal jurisdiction in his

individual capacity solely based upon his status as a corporate officer or agent."  D'Addario v.

Geller, 264 F.Supp.2d 367, 380-81 (E.D. Va. 2003).  However, a court may exercise jurisdiction

over a corporate agent where the individual had sufficient contacts with Virginia, even if those

contacts were made ostensibly on behalf of the corporation.  Id. (citing ePlus Technology, Inc. v.

Aboud, 313 F.3d 166, 177 (4th Cir. 2002) ("A corporate agent is properly subject to the

jurisdiction of the forum court if he committed a tort in his corporate capacity in the forum state

and service is made upon him under the forum state's long-arm statute.").  To this extent, a

corporate agent "who allegedly committed acts under the guise of acting on behalf of or for the

benefit of the corporation[, but where the it is alleged that these acts were in fact] for personal

gain, . . . cannot hide behind a 'fiduciary shield' to avoid personal jurisdiction."  Id.

### B. Virginia's Long-Arm Statute

In pertinent part, Virginia's long-arm statute provides:

> A.     A court may exercise personal jurisdiction over a person,
> who acts directly or by an agent, as to a cause of action arising from
> the person's:
> 1.     Transacting any business in this Commonwealth;
> . . .
> 3.     Causing tortious injury by an act or omission in this
> Commonwealth;
> 4.     Causing tortious injury in this Commonwealth by an act or
> omission outside this Commonwealth if he regularly does or solicits
> business, or engages in any other persistent course of conduct, or
> derives substantial revenue from goods used or consumed or
> services rendered, in this Commonwealth;

. . .

VA. CODE. ANN. § 8.01-328.1.A.

### C. The Due Process Clause

To satisfy constitutional due process requirements for personal jurisdiction, the plaintiff must show that the defendant has sufficient minimum contacts with the forum state such that exercising jurisdiction would not "offend traditional notions of fair play and substantial justice." International Shoe, 326 U.S. at 316. The minimum contacts must be such that the defendant could "reasonably anticipate being haled into court" in the forum state. World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980). The defendant must also "purposefully avail" itself "of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." Hanson v. Denckla, 357 U.S. 235, 253 (1958). Only in "rare cases" does a court's finding that the "minimum requirements inherent in the concept of 'fair play and substantial justice' defeat the reasonableness of jurisdiction" where the "defendant has purposefully engaged in forum activities." Asahi Metal Industry Co. v. Superior Court, 480 U.S. 102, 116 (1987) (citing Burger King Corp. v. Rudzewicz, 471 U.S. at 462, 477-478 (1985).

### III. FACTUAL BACKGROUND

This matter relates to a real estate transaction between Plaintiff and Chesapeake. Chesapeake occupied land on the Elizabeth River adjacent to that owned by Plaintiff. Doc. 15 at 3. As part of this transaction, Plaintiff purchased from Chesapeake a portion of its property, including a dock, and also obtained an option to purchase ("Option Agreement") the rest of the property, which comprised 7.7 acres ("Option Property"). Id. Together with this transaction, Chesapeake granted Plaintiff a lien though a Deed of Trust to secure Chesapeake's promises to maintain the Option Property in good condition, including a warranty that the land was free from

5

undisclosed hazardous materials and that Chesapeake would remove all buildings on the site at Roanoke's request should Chesapeake cease operations there.  Id.

In exchange for the dock property and the Option Agreement, Roanoke paid Chesapeake $1.4 million.  Id.  Payment was made via a wire transfer which by-passed Chesapeake and moved directly from Plaintiff to Frit Industries.  Doc. 7, unnumbered Ex. 1.  Plaintiff alleges that this money and the rest of Chesapeake's assets were immediately transferred to the remaining defendants, Chesapeake's two (2) parent companies, Frit Industries and Frit, Inc, and the five (5) officers and directors of these corporations ("Defendants"), for the purpose of rendering Chesapeake insolvent and preventing it from fulfilling its obligations under the Option Agreement.  Doc. 15 at 3-4.

Chesapeake's certificate to transact business in Virginia has since been revoked.  Doc. 1 ¶ 2.  All remaining corporate defendants are incorporated in and have their principal place of business in Alabama.  Id. ¶¶ 2-3.  The named individual defendants are residents of Alabama.  Id. ¶ 4.  Defendant Frit, Inc. is alleged to be the parent company of Chesapeake.  Id. ¶ 3.  Frit Industries is a holding company and allegedly owns Frit, Inc.[1]  Id.  The individual defendants were at various times officers and directors of Chesapeake and are alleged to have also been, at relevant times, directors and/or shareholders of Frit, Inc. and Frit Industries.  Id. ¶¶ 4-5.

In addition to its claims against Chesapeake, over whom personal jurisdiction is conceded, Plaintiff's Complaint alleges in support of its claim for voluntary conveyance that "Chesapeake Products distributed or otherwise transferred all cash (including the bulk of the

---

[1]These facts remain in dispute.  Defendants asserted at the hearing on this matter that Frit, Inc. is parent company of both Chesapeake and Frit Industries, as co-subsidiaries.

$1,400,000 purchase price for the dock area) and other money and assets to its parent companies, Frit Industries and Frit and/or to one or more of the remaining [individual] defendants."  Doc. 1 ¶ 51.  Plaintiff further alleges that such transfer was made "without consideration or for grossly inadequate consideration" and that Chesapeake was rendered insolvent as a result.  Id.

Plaintiff further pleads fraudulent conveyance by Chesapeake to the other defendants, alleging that this transfer made "with no consideration or inadequate consideration" and "with the intent to delay, hinder or defraud creditors including, but not limited to Roanoke Cement and/or its predecessor in interest."  Id. ¶ 55.  Plaintiff alleges that Frit, Inc., Frit Industries, and the five (5) individual defendants who were recipients of the transfer "had full knowledge" of Chesapeake's fraudulent intent when it conveyed "the sales proceeds of the 2001 sale to its parent company and/or to the individual shareholders, officers or directors . . . subsequently ceasing its operations," and that these defendants knew Chesapeake would not have the means to maintain the Option Property or otherwise perform as required under the Option Agreement.  Id. Accordingly, Plaintiff alleges that the remaining defendants' "looting of Chesapeake Products formed part of their fraudulent scheme to deprive the corporation of resources necessary to satisfy its obligations to Roanoke Cement under the Option Agreement.  Doc. 15 at 4.

In support of these allegations and in order to retain jurisdiction in this Court, Plaintiff has introduced exhibits in support of the remaining defendants' activities in the Commonwealth of Virginia.  See Doc. 15, Exs. A-C.  These include: a list of the five (5) officers and directors of Chesapeake, which includes all of the individual defendants, as recorded by the Virginia State Corporation Commission (Doc. 15, Ex. A); the Annual Reports of Chesapeake, Frit, Inc. and Frit Industries for the years 2001 and 2006, which show all three (3) corporations to have the same

President (Shelton E. Allred) and Secretary (Carl E. Schauble) (Id., Exs. A & B)[2]; a series of emails between representatives of Plaintiff corporation and individual defendants Terry W. Teeter ("Mr. Teeter") and Carl E. Schauble ("Mr. Schauble") in which they discuss the Option Agreement and negotiate its terms (Id., Ex. C)[3]; and, the Commonwealth of Virginia Department of Taxation Nonresident Real Property Owner Registration, which provides as seller of the Option Property "Chesapeake Products, Inc. c/o Frit Industries, Inc." (Id.).

Plaintiff also presented two (2) declarations of former Chesapeake employees. First, Plaintiff submitted the declaration of Diane B. McDonald, an employee of Chesapeake from 1993 through 2003, who attests that "[f]rom 1993 forward, Frit, Inc. and Frit Industries, Inc. were actively involved in the operation and management of Chesapeake Products, Inc." Id. ¶ 4. She specifically notes that Frit Industries administered the Chesapeake payroll system and that it regularly deposited her paychecks directly to her local Virginia bank account. Id. ¶ 5. Further, Ms. McDonald states that she reported to employees of Frit, Inc. and Frit industries in Alabama or Arkansas, beginning in 1993, and that her immediate supervisor was an employee of either Frit, Inc. or Frit Industries, not Chesapeake. Id. ¶ 6.

Second, Plaintiff offers as support for this Court's exercise of personal jurisdiction the affidavit of Judith T. Bowman, general manager of Chesapeake from 1993 through 2000. Id. (at Bowman Decl.) ¶ 3. She, too, reported to Frank Dabney, an employee of Frit, Inc. or Frit Industries. Id. In addition to having the payroll managed by Frit Industries, Ms. Bowman attests

---

[2]These Reports further identify the corporations as a fertilizer company, holding company, and fertilizer manufacturer, respectively. Id.

[3]Notably, the letters and emails signed by these defendants are signed either on Frit, Inc. letterhead or with Frit, Inc. included on the signature line. Id., Ex. C.

to the business the individual defendants conducted in Virginia.  <u>Id.</u> ¶¶ 5-20.   Ms. Bowman attests that Terry Teeter, who was responsible for conducting workplace safety audits and health and safety tests of the Chesapeake facility, made approximately six (6) separate trips to Virginia for business purposes during her period of employment and made monthly phone calls to Chesapeake for business purposes.  <u>Id.</u> ¶¶ 5-8.  Second, James Wyatt, in his capacity as purchaser of raw materials for Chesapeake, made approximately fourteen (14) trips to Virginia for business purposes during her employment and made monthly or twice monthly calls to Chesapeake's offices.  <u>Id.</u> ¶¶ 9-11.  Third, David Benefield who was responsible for sales, made approximately ten (10) trips to Virginia for business purposes and would call Chesapeake's offices approximately two (2) or three (3) times per month.  <u>Id.</u> ¶¶ 12-13.  Fourth, Shelton Allred, Mr. Benefield's father-in-law, made approximately two (2) trips to Virginia for business purposes and called Chesapeake's offices an average of one (1) or two (2) times per year.  <u>Id.</u> ¶¶ 14-16. Fifth, Carl Schauble, who oversaw a variety of environmental issues at Chesapeake, made approximately two (2) trips to Virginia for business purposes and an average of two (2) calls per year to Chesapeake's offices.  <u>Id.</u> ¶¶ 17-19.  Ms. Bowman further states that when these individual defendants made written contact with Chesapeake, it appeared on the official stationary of Frit, Inc. and/or Frit Industries.  <u>Id.</u> ¶ 20.

It is in light of the allegations contained in Plaintiff's Complaint and the contacts alleged in Plaintiff's Memorandum in Opposition that the Court must evaluate the law applicable to Defendants' Motions to Dismiss.

## IV. ANALYSIS

### A. Transacting Business Under Subsection (A)(1)

Plaintiff first alleges that the five (5) individual defendants and two (2) corporate defendants are subject to personal jurisdiction in this Court because they each transacted business in the Commonwealth and their actions are related to the subject-matter of this litigation.  In interpreting the term "transacting business" as it applies in subsection (A)(1), the United States Court of Appeals for the Fourth Circuit has noted that where it is " the purpose of the Virginia long-arm statute [] to extend jurisdiction to the extent permissible under the due process clause . . . a single act by a nonresident which amounts to transacting business in Virginia and gives rise to a cause of action may be sufficient to confer jurisdiction upon [Virginia] courts." English & Smith v. Metzger, 901 F.2d 36, 38 (4th Cir. 1990) (citations omitted).  "[A]rising from" as used in section (A) of Virginia's long-arm statute "should be broadly construed to mean 'related to' so as to include within 'transacting business' any contract performance activity in the forum even if not directly related to the alleged breach." Production Group International v. Goldman, 337 F.Supp.2d 788, 794 (E.D. Va. 2004).

The Court **FINDS** that it may exercise personal jurisdiction over two (2) of the individual defendants, Messrs. Teeter and Schauble, as well as Frit, Inc. and Frit Industries, because their transaction of business in Virginia gave rise to the instant lawsuit.  Plaintiff, through its exhibits, has demonstrated to the Court that Messrs. Teeter and Schauble emailed and wrote letters to Plaintiff's representatives in personal negotiation of the Option Agreement and did not purport to act in behalf of Chesapeake.  See Doc. 15, Ex. C.  The Option Agreement is at the very center of the parties' dispute, as Plaintiff alleges that Defendants conspired to achieve the voluntary and/or

10

fraudulent transfer of the profits of the Agreement.  See Doc. 1 ¶¶ 51, 55.  Accordingly, by

personally negotiating the Option Agreement pertaining to Virginia property, and ostensibly on

behalf of a Virginia business, these two (2) individual defendants transacted business within the

meaning of subsection (A)(1).[4]

      The Court **FINDS** it may exercise personal jurisdiction over Frit, Inc. because Teeter and

Schauble ignored corporate formalities in negotiating on behalf of Chesapeake when they signed

their correspondence as representatives of Frit, Inc. and not in behalf of Chesapeake, for which

they were also officers and directors.  See Doc. 15, Ex. C.  Teeter and Schauble therefore

negotiated the Agreement personally and as officers and directors of Frit, Inc. and each of them,

as well as Frit, Inc., may be hailed into Court as parties who negotiated the Option Agreement in

the Commonwealth of Virginia.  Accordingly, Plaintiff has persuasively alleged that Teeter,

Schauble and Frit, Inc. transacted business in Virginia which is related to the subject-matter of

the claims against them.  Where individuals fail to observe the formalities of their directorships

of Chesapeake, they may not hide behind the fiduciary shield of their directorship or corporate

offices to avoid personal jurisdiction.

      The Court **FINDS** it may also exercise personal jurisdiction over Defendant Frit

Industries because the records of the Commonwealth of Virginia Department of Taxation show

that the seller of the Option Property is "Chesapeake Products, Inc. c/o Frit Industries, Inc."  Doc.

---

[4]The Court further notes that these Defendants, under the facts alleged, may have also
violated their fiduciary obligations as officers and directors of Chesapeake, by ignoring their
corporate offices and acting instead on behalf of Frit, Inc.  The Court **FINDS** that if an
individual purports to be acting as an officer and/or director of a Virginia corporation, and he or
she performs acts in Virginia but does not observe the formalities of the corporate structure, then
the individual may subject him or herself to personal jurisdiction to the extent they may be
individually liable for actions not taken in the interests of the corporation.

15, Ex. C.  As seller of the Option Property, which is located in Virginia and the subject of this

lawsuit, Frit Industries transacted business in the Commonwealth within the terms of subsection

(A)(1).

The Court cannot, however, exercise personal jurisdiction over the remaining three (3)

individual defendants under this subsection, because Plaintiff has not produced evidence that

these parties had personal contact with Virginia in a manner giving rise to this action.

### B. Tortious Conduct In Virginia Under Subsection (A)(3)

Subsection (A)(3) of  § 8.01-328.1 requires that the defendant cause "tortious injury by an

act or omission" in Virginia.  The satisfaction of this provision requires that Plaintiff plead both

that it suffered tortious injury and that this injury was caused by an act or omission within the

Commonwealth of Virginia.  See id.

To determine whether personal jurisdiction exists pursuant to subsections (A)(3), and also

(A)(4), the Court must first consider whether Plaintiff's Complaint properly alleges tortious

conduct within the meaning of this section; specifically, the Court must determine whether

fraudulent conveyance is an action in tort or in equity.  While courts in various jurisdictions have

differed on whether a claim for fraudulent conveyance is governed by principles of equity or of

tort, Virginia courts have held that a claim of fraudulent conveyance under Virginia law sounds

in tort.  Terry v. June, 420 F.Supp.2d 493, 503 (W.D. Va. 2006) (holding that fraudulent

conveyance is a tort for choice of law purposes).  Though admitting that the determination of

whether fraudulent conveyance is a tort "is not a completely straightforward matter," the Terry

Court adopted this position because "a claim of fraudulent conveyance resembles an action in

tort in that the ultimate issue is not whether the conveyance from grantor to grantee was formally

12

valid as a matter of property law, but rather whether it was done for the purposes of defrauding one's creditors." Id. (citing cases from other districts supporting this proposition).  This position has been adopted by many jurisdictions and is the view promulgated by the Corpus Juris Secundum.  See 37 C.J.S. FRAUDULENT CONVEYANCES § 213 (April 2007 update) ("A cause of action for fraudulent conveyance is a species of tort, and is not a suit on a contract."); accord Sunrise Industrial Joint Venture v. Ditric Optics, 873 F.Supp. 765, 770 (E.D. N.Y. 1995) (citing cases from other districts with same holding).  The Court has considered those cases that have held fraudulent conveyance to be an equity action, and is not persuaded in light of the significant caselaw holding otherwise.  See In re Kaiser Steel Corp., 87 B.R. 154, 159 (Bankr. D. Colo.1988); United States v. Franklin Nat'l Bank, 376 F.Supp. 378, 383 (D.N.Y.1973); Federal Deposit Ins. Corp. v. Martinez Almodovar, 671 F.Supp. 851, 871 (D.P.R.1987) (all finding that fraudulent conveyance claims sound in equity because they seek the equitable remedy of voiding a conveyance rather than damages).

Because the weight of authority in Virginia holds that fraudulent conveyance is a tort, the Court **ADOPTS** this interpretation.  Accordingly, the Court **FINDS** that if Plaintiff proves its allegation that the wire transfer at issue was a fraudulent conveyance, this would be a tort for purposes of Virginia's long-arm statute.

Next, the Court must examine whether the tortious conduct alleged—the wire transfer—occurred in the Commonwealth of Virginia.  Plaintiff has alleged that the defendant officers and directors, in their capacity as representatives for all (3) corporate defendants, conspired to defraud Plaintiff by transferring the profits of the Option Agreement and all other assets to themselves, and that they did so for their own benefit.  Doc. 1 ¶ 55.  It is further alleged

that these defendants directed that Plaintiff wire the profits of the Option Agreement and sale of the dock property directly to Frit Industries.  Doc. 15.  Indeed, the Court may draw a reasonable inference to this effect because the five (5) individual defendants were officers and/or directors of all three (3) corporate defendants and the Statement of Wire Activity, which memorializes the wire transfer, shows that the money was sent from Plaintiff directly to Frit Industries.  Doc. 7, unnumbered Ex. 1; Doc. 15, Exs. A & B.  It is clear that to have the money sent not to Chesapeake, but directly to Frit Industries in Alabama, presumes that one or all of these defendants directed that Plaintiff, in Virginia, send the profits from Virginia to Alabama.  If it is proven that the instruction to transfer the profits of the Option Agreement, bypassing Chesapeake as owner of the property, is indeed a tort, then this single act, standing alone, is sufficient to confer personal jurisdiction under subsection (A)(3) of Virginia's long-arm statute.  See Metzger, 901 F.2d at 38; Shestul v. Moeser, 344 F.Supp.2d 946, 949 (E.D. Va. 2004) (recognizing that Virginia is a "single-act" state, requiring only a single tortious act within Virginia to meet the requirements of subsection (A)(3)).  Again, the individual defendants may not avoid personal jurisdiction by hiding behind their status as officers and directors of Chesapeake as they are alleged to have ignored the existence of Chesapeake as a corporate entity as well as their duties as officers and directors of Chesapeake.

Because Plaintiff has met its burden of alleging, and producing supporting evidence, that the corporate defendants and their officers and directors as individuals personally instructed that the money be wired out of the state of Virginia directly to Frit Industries, and that such transfer was fraudulent and for their personal benefit, the Court **FINDS** that it may exercise personal jurisdiction over all (7) defendants party to the instant Motions to Dismiss.  See Combs, 886 F.2d

at 676.

### C. Tortious Conduct Outside Virginia Plus Other Contacts Under Subsection (A)(4)

Though the Court has already found that it may exercise personal jurisdiction over four

(4) defendants under subsection (A)(1), and all defendants under subsection (A)(3), Plaintiff also

alleges jurisdiction under subsection (A)(4) and the Court **FINDS** that it may assert jurisdiction

over all defendants under this subsection, as well.

Applying subsection (A)(4) of Virginia's long-arm statute requires a two-step analysis.

See First American First, Inc. v. National Ass'n of Bank Women, 802 F.2d 1511, 1514 (4th Cir.

1986).  First, a court must determine whether the defendant caused tortious injury in Virginia by

an act or omission outside this Commonwealth.  Id.  Second, the court must evaluate whether "a

relationship between the defendant and the state which exists in any one of the three ways

specified in subsection (4)."  Id.   A court must therefore inquire into whether the defendant (1)

regularly does or solicits business, (2) engages in any other persistent course of conduct, or (3)

derives substantial revenue from goods used or consumed or services rendered, in the

Commonwealth of Virginia.  VA. CODE. ANN. § 8.01-328.1.A.4.

Defendants have alleged, but the Court does not agree, that a wire transfer takes place

solely in the location it is completed; in this instance, Alabama.[5]  See Doc. 18 at 3 (citing Terry,

---

[5]Defendants allege that the Court may not exercise personal jurisdiction under subsection
(A)(3) because, if the wire transfer is a tort, it took place in Alabama, where the transfer was
completed, and not in Virginia, where it was initiated.  See Doc. 18 at 3 (citing Terry, 420
F.Supp.2d at 504).  The Terry Court held that a wire transfer took place where it was completed,
but that Court was faced with determining where the tort of fraudulent wire transfer took place
for choice of law purposes.  See Terry, 420 F.Supp.2d at 504.  Terry is, for that reason,
distinguishable from the present matter.  Virginia is a "single act" state requiring only a single
tortious act to confer personal jurisdiction.  See Metzger, 901 F.2d at 38; Shestul, 344 F.Supp.2d
at 949. The Court **FINDS** that the single act of instructing an allegedly fraudulent transfer within

420 F.Supp.2d at 504 (holding that the wire transfer occurred in Michigan, where it was completed)).  The wire transfer, if proven to be a fraudulent transfer, indeed requires two acts: the initiation of the transfer in Virginia and the completion of the transfer in Alabama.  The first, the Court has already found, if proven, would be a tortious act within the Commonwealth of Virginia and is sufficient to confer personal jurisdiction under subsection (A)(3).  However, the second act, if proven, would also fulfill subsection (A)(4)'s first requirement that there be a tortious act outside the Commonwealth of Virginia.  Because defendants concede that the wire transfer was received in Alabama, the first step in the Court's (A)(4) analysis is met.  See Doc. 7, unnumbered Ex. 1.

The second prong of subsection (A)(4) requires that the defendants have substantial other contacts to show that they purposely directed their activities toward Virginia in a manner that would demonstrate it would be fair to hail them into court here.   Plaintiff has presented numerous exhibits that persuade the Court that all defendants to these Motions engaged in a persistent course of conduct within the Commonwealth, to a degree sufficient to meet the requirements of subsection (A)(4).

Defendants regularly do or solicit business in Virginia.  Plaintiff has proffered affidavits of Chesapeake employees, and other documents, which show that: (1) Frit Industries handled Chesapeake's payroll and deposited employee paychecks directly into their Virginia bank accounts; (2) defendant corporations employed the employees' supervisor; (3) the individual

---

Virginia is sufficient to exercise personal jurisdiction, even where the transfer was completed in another state.  It would not serve the interests of justice were an individual able to initiate a tortious act within the Commonwealth of Virginia, but be subject to the more rigorous personal jurisdiction requirements of subsection (A)(4), simply because the tort required two (2) acts, and the second occurred out of state.

defendants were responsible for much of how Chesapeake conducted its business in Virginia; (4) Frit Industries sold the Option Property to Plaintiff; and, (5) the individual defendants made several trips to Virginia and made regular phone calls to Virginia for the purpose of doing business.[6]  Doc. 15, Ex. C.  These activities, the declarants state, occurred regularly over a ten (10) year period.  Id.  Plaintiff further submitted emails and letters signed by individual directors on behalf of Frit, Inc. which expressly discussed the terms of the Option Agreement that is the subject of this suit.  Id.   These numerous and on-going business-related contacts with Virginia satisfy (A)(4)'s requirement that Defendants regularly do or solicit business.  Indeed, Plaintiff's allegations tend to show that Defendants individually controlled much of Chesapeake's business activities in Virginia, through Frit, Inc., Frit Industries, and personally, while ignoring their roles as officers and directors of Chesapeake.

Plaintiff has also alleged that Defendants derived substantial revenue from goods used or consumed or services rendered in the Commonwealth of Virginia.  As Chesapeake's parent company and holding company, and as its officers and directors, the Court may reasonably infer that defendants benefitted from monies earned by Chesapeake in Virginia.  Further, the wire transfer at issue conveyed the proceeds of land sold in Virginia.  $1.4 Million is certainly a substantial sum and it was gained by defendants as a result of a sale of goods in the Commonwealth.  Notably, the wire transfer statement is expressly annotated: "Sale of Chesapeake."  Doc. 7, unnumbered Ex. 1.  Accordingly, subsection (A)(4) may also be satisfied

---

[6]This is further conceded by many of the individual defendants in their affidavits.  See Doc. 9, Ex. A.  Defendants Teeter, Benefield, and Wyatt all state that they visited Virginia for business purposes, but that these visits were unrelated to "the purported conveyances of proceeds from any real estate transaction in Virginia as alleged in the Complaint."  Id.  The remaining individual defendants admit visiting Virginia but do not specify for what purpose.  Id.

by Plaintiff's allegations that Defendants derived substantial revenue from the Commonwealth of Virginia.

The Court therefore **FINDS** that it may exercise personal jurisdiction over all seven (7) defendants challenging jurisdiction, because they regularly conduct or solicit business in the Commonwealth of Virginia, and because they derived substantial revenue from goods used or services rendered within the Commonwealth.

### D. The Due Process Clause

Defendants' arguments, that there are insufficient minimum contacts to confer personal jurisdiction under the due process clause, are not tenable.  <u>See</u> Docs. 7 & 9.  Plaintiff has plead numerous purposeful activities by defendants that were specifically aimed at Virginia, including their responsibility for Chesapeake's operations in Virginia; that defendants allegedly directed the proceeds of the Option Agreement be transferred from Virginia to Alabama; and, that some or all of the defendants conducted the negotiations surrounding the Option Property, located in Virginia.  Indeed, the Court has found that personal jurisdiction exists over all defendants under two (2) subsections of Virginia's long-arm statute, and this statute has been interpreted to extend to the outer reaches of the due process clause.  Accordingly, there were sufficient activities with and about entities in Virginia to provide fair notice that Defendants may be hailed into court here.

For these reasons, Defendants' Motions to Dismiss are **DENIED**.

### V. MOTION FOR JURISDICTIONAL DISCOVERY

Plaintiff urges that, should the Court find that it has failed to make a prima facie showing of personal jurisdiction over some or all of the defendants, the Court should consider its Motion for Leave to Conduct Jurisdictional Discovery (Doc. 14) prior to ruling on this matter.  <u>See</u> Doc.

15 at 20.  Because the Court has denied Defendants' Motions, Plaintiff's Motion is **DENIED** as **MOOT**.

## VI. CONCLUSION

For the reasons stated herein, Defendants' two (2) Motions to Dismiss are **DENIED**.  The Court may exercise personal jurisdiction over Defendants Teeter, Schauble, Frit, Inc., and Frit Industries under subsection (A)(1) because these defendants transacted business in Virginia and their acts gave rise to the instant lawsuit.  The Court may also exercise personal jurisdiction over all seven (7) defendants party to these Motions, because they both allegedly caused a tortious act within Virginia under subsection (A)(3), and allegedly caused a tortious act outside Virginia but directed significant other activities at the Commonwealth.  By virtue of these activities, Plaintiff has also shown sufficient minimum contacts that the Court's exercise of personal jurisdiction conforms with the due process clause of the Fourteenth Amendment.

Because Defendants' Motions are **DENIED**, Plaintiff's Motion for Jurisdictional Discovery is **DENIED** as **MOOT**.

The Clerk is **REQUESTED** to send a copy of this Order to all counsel of record.

It is so **ORDERED**.


_____/s/_____
HENRY COKE MORGAN, JR.
SENIOR UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
July 10, 2007